UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: JAN 2 2 2014
```

JUAN ROLON,

           Plaintiff,

-against-

COMMISSIONER OF SOCIAL SECURITY,

           Defendant.

<u>MEMORANDUM AND ORDER</u>

12 Civ. 4808 (AJN)

ALISON J. NATHAN, District Judge:

      On June 22, 2012, Plaintiff Juan Rolon commenced this action for review of the final decision of the Commissioner of Social Security ("the Commissioner"), denying his application for Social Security Disability ("SSD") and Supplemental Security Insurance ("SSI") benefits. Dkt. No. 2. The Defendant moves for a judgment on the pleadings, affirming the final decision that Plaintiff is not disabled within the meaning of the Social Security Act, 42 U.S.C. § 1383, *et seq*. Dkt. No. 17. Plaintiff cross-moves for judgment on the pleadings and requests (1) reversal of the Commissioner's decision, with remand to the Social Security Administration ("SSA") for further administrative proceedings and a new decision; and (2) approval of the contingent fee arrangement under 42 U.S.C. § 406(b) and the award of attorney's fees, pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412(d). Dkt. No. 20. For the reasons that follow, the Commissioner's motion for judgment on the pleadings is DENIED, Rolon's motion is GRANTED, and the case is remanded for further administrative proceedings.

I.    **BACKGROUND**

      The following facts are taken from the administrative record ("R.") of the Social Security Administration in this case. Dkt. No. 16.

A.  **Application History**

Plaintiff applied for SSI and SSD disability benefits as of March 10, 2009. R. 85–86, 216–20. The SSA denied Rolon's application on June 25, 2009, finding he could have performed light work and a job with simple tasks. R. 85–86, 106–20. Rolon then requested an administrative hearing, R. 122–24, which Administrative Law Judge Jeffrey Jordan conducted by videoconference on June 23 and September 1, 2010. R. 39–44, 45–84. At the hearing, Rolon testified about his life history, past employment, and medical conditions, including depression, anxiety, and back pain. R. 49–65, 69–71. Dr. Sylvio Reyes, vocational expert, testified about Rolon's previous employment and current work capacity. R. 65–69, 71–82. On September 20, 2010, the ALJ issued a decision denying Rolon's application, finding he was not disabled. R. 87–104. Rolon requested review, R. 11, and submitted additional medical documentation from an April 2011 CT scan. R. 577. The Appeals Council denied his request on May 9, 2012, making the ALJ's decision the Commissioner's final decision. R. 1–4. Rolon then filed this action on June 22, 2012. Complaint, Dkt. No. 2.

B.  **Plaintiff's Personal and Employment History**

Rolon was born March 30, 1969, in the Bronx, New York, and had a decent childhood growing up with his parents, four brothers, and three sisters. R. 49, 216, 526. He was very close to his father, who was "the best father." R. 333. Rolon attended school through the eleventh grade and later obtained his GED. R. 253, 328. In the early 1990s, he worked as an apartment building porter, operating machinery, and carrying heavy furniture and garbage bags. R. 51, 227, 248, 267–270. Suffering a herniated disc and pinched nerve in his back, Rolon had back surgery. R. 60, 568. Afterwards he has worked intermittently. He maintained short-tenured, part-time positions as a stock worker and plasterer during the 1990s, and worked as a driver for a dog day-care center from 2003 to 2005. R. 49–50, 60, 69–71, 248, 267–72. In the time since his alleged disability onset date, Rolon worked just one day, attempting and failing to work for a

moving company in 2007. R. 52, 228. He lives in the Bronx with his sons and their mother. R. 49, 216.

### C.     Treating Sources

The administrative record included various medical and other treatment records. The following is a brief summary of the relevant points.

#### *1.     Sound View Mental Health Clinic*

Rolon began receiving mental health treatment at Sound View Mental Health Clinic on March 29, 2010 after a referral from the Bronx Lebanon Hospital Mobile Crisis Team. R. 523–25. He was evaluated and counseled there during the following months by psychiatrist Dr. Phyllis Bogard and Licensed Clinical Social Worker Lorna Williams. R. 515–576.

On April 6, 2010, Dr. Bogard examined Rolon and diagnosed him with depressive disorder not otherwise specified (NOS), as well as back pain, high blood pressure and high cholesterol. R. 519, 523. Rolon reported being depressed for several years, following the death of his father and brother. R. 519. Rolon was shot in the chest at age 24, and since that time he has disliked being around unfamiliar people, and has experienced memories, nightmares, and flashbacks. R. 519. He did not like having people behind him, and mostly stayed home. *R.* 519. He did not know the help Sound View provided was possible, and was encouraged by the opportunity to learn anxiety-reducing skills and receive therapy. R. 521.

Dr. Bogard found as a result of the mental status exam that Rolon had a cooperative attitude, appropriate affect, depressed mood, normal speech, logical goal-directed thought process, did not have delusions or hallucination, and was not suicidal or homicidal. R. 520. Rolon's Global Assessment of Functioning (GAF) score was 55, indicating moderate symptoms or moderate difficulties in functioning. R. 521. Dr. Bogard prescribed the drugs Abilify and Lexapro for depression. R. 520.

On April 14, 2010, Dr. Bogard again treated Rolon, discussing his continuing depression, irritability, and difficulty with the death of his father. R. 533. Rolon described his recent dreams

of his father and his experiences at the funeral. R. 533. Dr. Bogard found that Rolon's functioning had worsened to a GAF score of 50, that the medication made him sleepy but not less depressed, and increased the Abilify dose from 2mg to 5mg daily. R. 533.

On May 14, 2010, Dr. Bogard examined Rolon and found that his GAF score remained at 50, that he was still "very attached emotionally" to his deceased family, and that he remained depressed. R. 549–50. Dr. Bogard prescribed new depression medications, including Deplin, Wellbutrin-XL, and an increased dose of Abilify. R. 549.

On July 16, 2010, Rolon limped in one hour late to his appointment with Dr. Bogard, and described the radiating pain in his left leg. R. 567–68. Dr. Bogard found that he was again depressed but not suicidal, was "stay[ing] alive for his two sons." R. 568. Dr. Bogard noted a GAF score of 55. R. 568.

Finally, on August 19, 2010, Dr. Bogard completed an SSA form called Medical Source Statement of Ability to Do Work-Related Activities (Mental). R. 572–74 (Form HA-1152-03 (11/2002)). Assessing Rolon's abilities based on her findings from his time as a Sound View patient, Dr. Bogard reported several "marked" impairments. R. 572–73. These findings indicated that Rolon's impairment imposed "serious limitation[s] . . . [such that t]he ability to function is severely limited, but not precluded," in his ability to "Understand and remember short, simple instructions," "Interact appropriately with the public," "Interact appropriately with co-workers," "Respond appropriately to work pressures in a usual work setting," and "Respond appropriately to changes in a routine work setting." R. 572–73.

Rolon's treatment at Sound View also included at least ten counseling sessions with LCSW Williams, with Dr. Bogard acting as attending physician, on March 29, April 9, April 15, April 22, May 4, May 13, May 20, June 25, July 6, and July 27. R. 525, 530, 536–37, 538–39, 541–42, 546–47, 552–53, 561, 564–65, 570–71. Rolon also missed appointments on April 29, June 15, and June 16. R. 544, 557–60.

### D. Consultative Examinations

#### 1. Dr. Herb Meadow

Dr. Herb Meadow performed a consultative psychiatric evaluation of Rolon on behalf of the SSA on May 18, 2009. R. 343–46. Dr. Meadow reported that Rolon has two ruptured disks and two pinched nerves in his back, which required surgery at Yonkers General Hospital in the early 1990s. R. 343, 347; *see R.* 60. He was hospitalized at Lincoln Hospital with a gunshot wound to his chest, and a bullet remains embedded behind his heart. R. 343, 347; *see R.* 443, 445, 474. Since 1998, he has been infected with Hepatitis C. R. 347.

Dr. Meadow's mental status examination "revealed a man whose demeanor was cooperative[, and m]anner of relating was adequate." R. 344. Rolon had "[c]oherent and goal directed" through processes without evidence of hallucinations, delusions, or paranoia. R. 344. His affect was "[a]ppropriate in speech and thought content." R. 344. His mood was depressed, and his cognitive functioning average. R. 344. Dr. Meadow stated that Rolon cared for his personal hygiene, and "does some minimal household chores . . . [d]epending on his back." R. 345. Dr. Meadow noted that Rolon "socializes with his immediate family, [and] spends his days watching television." R. 345.

From the above, Dr. Meadow concluded that Rolon "would be able to perform all tasks necessary for vocational functioning[, as t]he results of the examination appear to be consistent with psychiatric problems, but in itself does not appear to be significant enough to interfere with the claimant's ability to function on a daily basis." R. 345. Dr. Meadow diagnosed adjustment disorder with depressed mood, heroin abuse/dependence in remission, opiate dependence, hepatitis C, hypertension, and back pain. R. 345.

#### 2. Dr. Sharon Revan

Dr. Sharon Revan also performed one consultative physical evaluation of Rolon on behalf of the SSA on May 18, 2009. R. 347–51. Dr. Revan found Rolon had "mild limitation walking distances and climbing stairs . . . [n]o limitations with standing and lying down . . . [and]

mild limitations with prolonged physical activities of sitting due to low back pain." R. 350. Dr. Revan stated that Rolon's "[l]imitations with personal grooming and activities of daily living are secondary to his back pain." R. 350.

### E. The ALJ's Decision

The ALJ issued a decision on September 20, 2010, following the standard five-step inquiry used for determining disability. R. 87–104. In the first step of the inquiry, the ALJ determined that Rolon had not performed substantial gainful activity in the relevant period, noting that Rolon had worked just one day since the alleged disability onset date, and had stopped due to his back problem. R. 92.

At step two, the ALJ next found that Rolon's medical issues—affective disorder, disorder of the back, hepatitis C, and "residuals of status post gunshot wound to chest"—did collectively rise to the level of a "severe medically determinable physical or mental impairment" "caus[ing] significant limitations in the claimant's ability to do basic work activities." R. 92–93; *see* 20 C.F.R. §§ 404.1520, 416.920.

At step three, further considering the medical severity of Mr. Rolon's impairments, the ALJ decided his did not meet or medically equal the "Appendix 1" impairments which compel a finding of disability. R. 93; 20 C.F.R. pt. 404, subpt. P, app. 1. The ALJ concluded that the medical record "does not establish that the claimant has [such] an impairment . . . [as] [n]o treating, examining, or consulting physician has noted findings or opined that the severity of the claimant's impairments meets or equals a listed impairment" from appendix 1. R. 93.[1]

---

[1] The Court does not read plaintiff's arguments to challenge the ALJ's finding regarding the listed impairment determination. Plaintiff's representative argued for a finding under the appendix 1 category 12.04, Affective Disorder, but Plaintiff must carry the burden at this step, *see* 20 C.F.R. § 404.1520, and Plaintiff's counsel has not argued error in this determination. Therefore, this Court's review focuses on step four, the residual functional capacity determination. *See Chase v. Astrue*, 11 Civ. 0012 (RRM), 2012 WL 2501028 (E.D.N.Y. June 28, 2012).

At step four, the ALJ "assess[ed] and ma[d]e a finding about [the claimant's] residual functional capacity based on all the relevant medical and other evidence." 20 C.F.R. §§ 404.1520(e), 416.920(e). Considering Rolon's mental impairments, the ALJ found that Rolon had "the residual functional capacity to perform less than a full range of light work . . . limited to simple, routine, low-stress tasks with no more than brief superficial contact with supervisors, co-workers, and the public." R. 94. The ALJ found Rolon could physically "lift/carry/push/pull up to 20 pounds occasionally and 10 pounds frequently[;] . . . can stand/walk six hours and sit six hours within an eight-hour workday but sit no more than two hours before alternating to standing and stand no more than 30 to 60 minutes before alternating to sitting[;] . . . must avoid climbing . . . but could perform other postural movement on an occasional basis." R. 94.

The ALJ determined that Rolon's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but decided that "the claimant's statements concerning the intensity, persistence, and limiting effects . . . are not credible to the extent they are inconsistent with the above residual functional capacity assessment." R. 97.

In making the RFC determination, the ALJ gave "significant weight" to the consulting examiners' assessments and statements, finding them "supporting by findings on mental status and physical examinations and [also] consistent with the other evidence of record when viewed as a whole." R. 97. The entire determination was based on Drs. Meadow and Revan's findings, as the ALJ gave no weight to the findings of treating physician Dr. Bogard, and did not rely on any other sources. R. 97.

The ALJ gave the following explanation for lack of weight given to Dr. Bogard's findings:
> No weight is also given to Dr. Bogard's assessment at Exhibit 14F, of marked limitations in being able to understand and remember short simple instructions, interact with the public and co-workers, respond appropriately to work pressures in a usual work setting, and respond appropriately to changes in a routine work setting. This assessment is not supported by findings on mental status examinations, and it is inconsistent with Dr. Bogard's own assessment of slight and moderate limitations. For instance, Dr. Bogard reported that the claimant had a cooperative attitude, normal psychomotor behavior, normal speech, logical/goal directed thought processes, and intact judgment without delusions or hallucinations. (Exhibit 13F). In addition, Dr. Bogard was inconsistent in

7

> the analysis of the claimant's capabilities. Dr. Bogard classified that the claimant had marked limitations in understanding and remembering short, simple instructions and only moderate limitation in carrying out detailed instructions, and no limitations in carrying out simple instructions and making judgments on simple work-related decisions. Furthermore, Dr. Bogard reported that the claimant only had a slight limitation in understanding and remembering detailed instructions. Following Dr. Bogard's analysis the claimant would be able to understand/remember/carry out detailed instructions better than he would be able to do the same given simple instructions. (Exhibit 14F).

R. 97–98.

Based on the above findings, the ALJ considered whether the claimant would be able to perform any past relevant work. R. 98; *see* 20 C.F.R. §§ 404.1520(f), 416.920(f). The ALJ found that Rolon was unable to do so, based on vocational expert testimony that a hypothetical individual of his age, education, work background, and residual functional capacity could not perform any of his previous jobs of animal attendant, delivery driver, or industrial cleaner. R. 98.

In the final step, the ALJ decided that Rolon could adjust to other work that exists in significant numbers in the national economy, considering his residual functional capacity, age, education, and work experience. R. 99; *see* 20 C.F.R. §§ 404.1520(g), 416.920(g), 404.1560(c), 416.960(c). The ALJ found that Mr. Rolon could make a successful adjustment to several categories of work, including "garment sorter," "tag inserter," and "labeler." R. 99. Given this, the ALJ reached the end of the five-step process, concluded that Mr. Rolon was not disabled, and denied his application for SSD and SSI benefits. R. 100.

## II. STANDARD OF REVIEW

In reviewing a decision of the Commissioner, the Court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for rehearing." 42 U.S.C. § 405(g). Although the Court "undertake[s] [its] own plenary review of the administrative record," *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996), ultimately, "[i]t is not [the Court's] function to determine *de novo* whether [Plaintiff] is disabled." *Id.* Rather, the Court performs a limited review and "may set aside the Commissioner's determination that a claimant is not

disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error." *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008) (quoting *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000) (internal quotation marks omitted)). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938); *see Burgess*, 537 F.3d at 127–28.

Because the Court "may not properly 'affirm an administrative action on grounds different from those considered by the agency,'" *Burgess*, 537 F.3d at 128 (quoting *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999)), "[w]hen there are gaps in the administrative record or the ALJ has applied an improper legal standard," the case will generally be "remanded to the [Commissioner] for further development of the evidence." *Pratts*, 94 F.3d at 39.

## III. DISCUSSION

A claimant is disabled under the SSA when he or she lacks the ability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work . . . ." *Id.* § 423(d)(2)(A). Such impairments must be demonstrable by medically acceptable clinical and laboratory diagnostic techniques. *Id.* § 423(d)(3).

Social Security Regulations set forth a five-step sequential evaluation process for deciding whether an individual is disabled:

> 1. The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.

2. If not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities.

3. If the claimant has a "severe impairment," the Commissioner must ask whether, based solely on medical evidence, claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience.

4. If the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.

5. If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Shaw*, 221 F.3d at 132; *see* 20 C.F.R. §§ 404.1520, 416.920.

### A. The Mental Residual Functional Capacity Determination

Rolon challenges the ALJ's decision at step four regarding his mental residual functional capacity, arguing that the ALJ erred by (1) failing to fulfill his duty to develop the record; and (2) failing to properly apply the treating physician rule to Dr. Bogard's findings.

#### 1. Failure to Develop the Record

Rolon argues that the ALJ's affirmative duty to develop the record required the ALJ to recontact Dr. Bogard for clarification when he perceived her report had an internal inconsistency—that Rolon had "marked limitations" with simple instructions but only "slight limitations" with detailed instructions—before proceeding to a decision. Pl.'s Mem. 18. The Commissioner replies that because "the medical record was complete, the ALJ was not required to recontact a medical source in advance of rejecting her opinion." Def.'s Oppo. 3–4 (citing *Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999); *Perez v. Chater*, 77 F.3d 41, 48 (2d Cir. 1996)). Rolon counters that *Rosa* specifically requires an ALJ to "recontact a treating source whose opinion establishes qualifying functional limitation but for whom the ALJ perceives a lack of support." Pl.'s Reply 6.

10

Failure to seek any clarification of the perceived inconsistencies in Dr. Bogard's findings about the claimant's marked and other limitations was legal error. "[T]he social security ALJ, unlike a judge in a trial, must on behalf of all claimants," including those represented by counsel, "affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (quoting *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 508–09 (2d Cir. 2009) (citing cases). "In light of the ALJ's affirmative duty to develop the administrative record, 'an ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record.'" *Burgess*, 537 F.3d at 129 (quoting *Rosa v. Callahan,* 168 F.3d 72, 79 (2d Cir. 1999)). The Social Security Act requires the Commissioner to "make every reasonable effort to obtain from the individual's treating physician . . . all medical evidence, including diagnostic tests, necessary in order to properly make such determination, prior to evaluating medical evidence obtained from any other source on a consultative basis." 42 U.S.C. § 423(d)(5)(B). Applicable SSA regulations further require an ALJ to "seek additional evidence or clarification from [the] medical source when [a] report from [the] medical source contains a conflict or ambiguity that must be resolved" to determine whether the claimant is disabled. 20 C.F.R. §§ 404.1512(e)(1), 416.912(e)(1) (2010), *amended*, How We Collect and Consider Evidence of Disability, 77 Fed.Reg. 10,651, 10,656 (Feb. 23, 2012) (deleting former paragraphs (e) and redesignating former paragraphs (f) as paragraphs (e), effective March 26, 2012); *see Lowry v. Astrue,* 474 F. App'x 801, 805 n. 2 (2d Cir. 2012) (addressing the amendment and applying the version in effect when the ALJ adjudicated the claim).

A perceived internal inconsistency about a critical finding is a "conflict or ambiguity" which requires the ALJ to further develop the record by "seek[ing] additional evidence or clarification" from the treating physician. 20 C.F.R. §§ 404.1512(e)(1), 416.912(e)(1) (2010). "[I]f a physician's report is believed to be insufficiently explained, lacking in support, or inconsistent with the physician's other reports, the ALJ must seek clarification and additional

information from the physician, as needed, to fill any clear gaps before rejecting the doctor's opinion." *Correale-Englehart v. Astrue*, 687 F. Supp. 2d 396, 428 (S.D.N.Y. 2010); *see also Cabassa v. Astrue*, No. 11 Civ. 1449 (KAM), 2012 WL 2202951, at *10 (E.D.N.Y. June 13, 2012) (citing *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998) ("[W]hen an ALJ believes that a treating physician's opinion . . . is internally inconsistent, he may not discredit the opinion on this basis but must affirmatively seek out clarifying information from the doctor.")); *see, e.g., Rosa,* 168 F.3d at 79 (citing *Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998) ("[E]ven if the clinical findings were inadequate, it was the ALJ's duty to seek additional information . . . *sua sponte*.")).

Since an ALJ's duty to seek clarification applies only to a conflict or ambiguity that *must* be resolved to make the disability determination, minor or irrelevant inconsistencies do not require an ALJ to act upon the duty to further develop the record. Dr. Bogard's findings presented a significant ambiguity by appearing to the ALJ to state that "the claimant would be able to understand/remember/carry out detailed instructions better than he would be able to do the same given simple instructions," which the ALJ reasonably saw as presenting a conflict between "marked limitations [regarding] . . . short, simple instructions and only moderate [and slight] limitations [regarding] detailed instructions." R. 98. Whether or not Rolon had the "marked limitations" at issue had to be resolved in order to determine whether he was disabled. The ALJ ought to have recontacted Dr. Bogard to ascertain whether (a) the marked limitations indicated were incorrect; (b) the moderate and slight limitations indicated were incorrect; or (c) there was a basis for the apparent inconsistency. Instead, the ALJ resolved the conflict by giving Dr. Bogard's opinion no weight. R. 97. In doing so, the ALJ impermissibly "engage[d] in his own evaluations of the medical findings," *Burgess*, 537 F.3d at 131, improperly substituting his own lay opinion for Dr. Bogard's opinion as treating physician.

The applicable regulations required the ALJ to recontact Dr. Bogard. Even under the current amended regulations, which give an ALJ more discretion to "determine the best way to

12

resolve the inconsistency or insufficiency" based on the facts of the case, the first option is still to recontact the treating physician. 20 C.F.R. §§ 404.1520b(c)–(c)(1), 416.920b(c)–(c)(1) (2013). *See Lowry*, 474 F. App'x at 805 n. 2 (applying the version of the regulation in effect when the ALJ adjudicated the claim).[2] The Court therefore will remand to the Commissioner. On remand, the ALJ must attempt to recontact Dr. Bogard to obtain clarification regarding the purportedly inconsistent findings.

2. *Treating Physician Rule*

Rolon also argues the ALJ erred by rejecting the opinion of treating physician Dr. Bogard without adhering to the requirements of the treating physician rule. Pl.'s Br. 14. The Commissioner replies that the ALJ properly relied on Dr. Meadow's opinion because (1) Dr. Meadow's opinion was well-supported and more consistent with the overall record than Dr. Bogard's opinion, and SSA regulations support giving more weight to a medical source with more supporting evidence; and (2) "the ALJ gave good reason for rejecting Dr. Bogard's opinion," viz., its inconsistency with mental status findings and internal inconsistency. Def.'s Oppo. at 1–3. The Court has already determined that the ALJ erred in not first recontacting Dr. Bogard to obtain clarification of the inconsistency. For the reasons that follow, the Court also concludes that the ALJ erred in thereafter giving 'no weight' to Dr. Bogard's findings without an explanation comporting with the "treating physician rule" embodied in SSA regulations.

---

[2] *See also Jimenez v. Astrue*, No. 12 Civ. 3477 (GWG), 2013 WL 4400533, at *11 (S.D.N.Y. Aug. 14, 2013) (noting that "[a]lthough the Social Security Administration recently changed its regulations to reduce the situations in which an ALJ must recontact medical providers, the regulations still contemplate the ALJ recontacting treating physicians when 'the additional information needed is directly related to that source's medical opinion'") (citing 77 Fed.Reg. at 10,652); *Perrin v. Astrue*, No. 11 Civ. 5110 (FB), 2012 WL 4793543, at *3 n. 3 (E.D.N.Y. Oct. 9, 2012) (requiring an ALJ to recontact a treating physician on remand because, "the modifications [to the regulation] do not substantively change the ALJ's obligations"); *Cabassa*, 2012 WL 2202951, at *10 n. 13 (noting that "[t]he SSA has stated that the modification does not, however, 'alter an adjudicator's obligations' and is consistent with [42 U.S.C. § 423(d)(5)(B),] . . . which requires the Commissioner to 'make every reasonable effort to obtain from the individual's treating physician . . . all medical evidence, including diagnostic test, necessary in order to properly make such determination, prior to evaluating medical evidence obtained from any other source on a consultative basis'") (citing 77 Fed.Reg. at 10,652).

The treating physician rule provides several procedural and substantive advantages to ensure an ALJ grants "deference to the views of the physician who has engaged in the primary treatment of the claimant." *Burgess*, 537 F.3d at 128 (quoting *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003)); *see also Schisler v. Sullivan*, 3 F.3d 563, 564 (2d Cir. 1993) (upholding regulations superseding the Second Circuit's more deferential version of the rule).

The term "[t]reating source means [a claimant's] own physician, psychologist, or other acceptable medical source who provides [the claimant] . . . with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." 20 C.F.R. §§ 404.1502, 416.902. The ALJ remarked that Dr. Bogard was Rolon's "treating psychiatrist," R. 96, and there is no dispute that Dr. Bogard was a treating source.

Treating sources are owed deference because they "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) (2013). The treating physician rule imposes upon the ALJ, at a minimum, a higher duty of explanation when determining the weight that must be given to a treating source's opinion.[3] Failure to properly apply the treating physician's rule, or consider the required factors, constitutes legal error and is a sufficient basis for remand. *See Chase*, 2012 WL 2501028, at *12.

The Commissioner asserts that "the ALJ properly relied upon the medical opinion of consultative examiner . . . Dr. Meadow . . . over the restrictive assessment from Dr. Bogard because it was well-supported and more consistent with the overall record." Def.'s Oppo. at 2. The Commissioner is correct that "[g]enuine conflicts in the medical evidence are for the

---

[3] The Second Circuit has not decided "whether the [treating physician] rule functions . . . as a "disappearing presumption," . . . as a "tiebreaker," or as some third possibility," and has stated only "that the rule imposes on the Commissioner a heightened duty of explanation when a treating physician's medical opinion is discredited." *Gunter v. Comm'r of Soc. Sec.*, 361 F. App'x 197, 199 (2d Cir. 2010) (citing *Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006)).

14

Commissioner to resolve," and that in general an "ALJ is entitled to select between the conflicting evidence in the record." Def.'s Oppo. at 1 (citing *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002)).

However, in identifying and resolving these conflicts, the ALJ still must apply the treating physician rule. Before relying on a consultative source, the ALJ must first properly address the treating physician's opinion. Despite claiming to have followed the treating physician rule and "considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and 416.927, and S[ocial ]S[ecurity ]R[uling] 96-2p," R. 94, the ALJ did not adequately do so. The decision does not reveal that the ALJ actually provided the required "procedural advantages" or afforded the benefits of "the substance of the treating physician rule." *Cf. Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) ("[A] searching review of the record . . . assure[d]" the Court that the claimant had "received the rule's procedural advantages" such that it could "conclude that the substance of the treating physician rule was not traversed."). As discussed below, here the ALJ's application of the treating physician rule fell short.

First, the ALJ must explicitly consider factors specified by SSA regulations. In the Second Circuit, "to override the opinion of a treating physician . . . the ALJ must *explicitly* consider, *inter alia*: (1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013) (citing *Burgess*, 537 F.3d at 129) (emphasis added); *see* 20 C.F.R. §§ 404.1527, 416.927; *see also Gunter* , 361 F. App'x at 199 ("Before an ALJ may elect to discredit the medical conclusions of a treating physician, she must explicitly consider" the factors specified in the regulation); *Schaal,* 134 F.3d at 504 (ALJ committed legal error by failing to "consider all of the factors cited in the regulations"). The ALJ's decision erred by

failing to explicitly consider several required factors, including Dr. Bogard's specialty, and the frequency, length, nature, and extent of treatment.[4]

While the ALJ's decision elsewhere mentioned that Dr. Bogard was a psychiatrist, R. 96, the explanation for giving no weight ignores the regulation stating that her status as a specialist is supposed to provide additional weight. An ALJ should "generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the

---

[4] The regulations provide in full that the SSA "consider[s] all of the following factors in deciding the weight we give to any medical opinion" and "appl[ies] the factors listed" below:

    (i) Length of the treatment relationship and the frequency of examination. Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a nontreating source.

    (ii) Nature and extent of the treatment relationship. Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories. For example, if your ophthalmologist notices that you have complained of neck pain during your eye examinations, we will consider his or her opinion with respect to your neck pain, but we will give it less weight than that of another physician who has treated you for the neck pain. When the treating source has reasonable knowledge of your impairment(s), we will give the source's opinion more weight than we would give it if it were from a nontreating source.

    (3) Supportability. The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion. Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions. We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources.

    (4) Consistency. Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

    (5) Specialization. We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

    (6) Other factors. When we consider how much weight to give to a medical opinion, we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the opinion. For example, the amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with the other information in your case record are relevant factors that we will consider in deciding the weight to give to a medical opinion.

20 C.F.R. §§ 404.1527(c)–(c)(6), 416.927(c)–(c)(6) (2013).

16

opinion of a source who is not a specialist." 20 C.F.R. §§ 404.1527(c)(5), 416.927(c)(5). Since this is only true "generally" an ALJ is free to advance a reason to the contrary, but in this case the ALJ did not "explicitly consider" "whether the [treating] physician is a specialist" "[i]n order to override the opinion of [that] treating physician." *Selian*, 708 F.3d at 419.

Next, the ALJ did not address the fact that Dr. Bogard's relationship with Rolon involved frequent appointments over a period of more than four months. Rolon saw Dr. Bogard at least four times from March to August, adjusting his medication several times, and Rolon was seen in Dr. Bogard's clinic by LCSW Williams, with Dr. Bogard as attending physician, at least ten more times. R. 515–571. The decision does not explicitly consider this, ignoring the regulations' statement that "[w]hen the treating source has seen [the claimant] a number of times and long enough to have obtained a longitudinal picture of [the] impairment, [the ALJ] will give the source's opinion more weight than we would give it if it were from a nontreating source." 20 C.F.R. §§ 404.1527(c)(2)(i), 416.927(c)(2)(i) (2013); *see Selian*, 708 F.3d at 419–20. The ALJ therefore erred by giving no weight to Dr. Bogard's findings without providing the required explicit consideration of the treating physician's specialty or the frequency, length, nature, and extent of treatment.

In addition to considering the required factors, an ALJ must ultimately "give good reasons in [the] notice of determination or decision for the weight [the ALJ] give[s] [a claimant's] treating source's opinion." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). The ALJ must fulfill the "heightened duty of explanation [that exists] when a treating physician's medical opinion is discredited." *Gunter*, 361 F. App'x at 199. Failure to do so warrants remand. *Selian*, 708 F.3d at 419 (citing *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir.1999)). Constrained to consider only the ALJ's own stated reasons for giving Dr. Bogard's opinion no weight, not the Commissioner's later explanations, the Court finds the reasons fall short of the "good reasons" required.

The Commissioner's arguments for why "the ALJ gave good reason[s] for rejecting Dr. Bogard's opinion" are untenable. Def's Oppo. 3. The ALJ was not "entitled to select between the conflicting evidence in the record," Def.'s Mem. 17, without following the treating physician rule, which required properly "addressing Dr. [Bogard]'s diagnosis on its merits." *Selian*, 708 F.3d at 419. Even if Dr. Meadow's opinion is indeed "well-supported and more consistent with the overall record," Def.'s Oppo. at 2, the ALJ did not provide Dr. Meadow's opinion as a basis for giving Dr. Bogard's opinion no weight.

The ALJ did not properly address Dr. Bogard's opinion on the merits, improperly advancing his own lay opinion of the deficiencies in her findings. As the Court found above, these required the ALJ to recontact Dr. Bogard. An ALJ "is not free to set his own expertise against that of a physician who submitted an opinion to or testified before him or to engage in his own evaluations of the medical findings." *Burgess*, 537 F.3d at 131 (quoting *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998)) (alterations and quotation marks omitted). "Neither a reviewing judge nor the Commissioner is 'permitted to substitute his own expertise or view of the medical proof for the treating physician's opinion.'" *Id.* (quoting *Shaw*, 221 F.3d at 134).

Had the ALJ followed the proper legal standards of the treating physician rule, and in doing so had claimed or shown that other doctors' findings were inconsistent with Dr. Bogard's, a reviewing court might have been able to conclude that Dr. Bogard's findings were properly given no weight due to an inconsistency with other substantial evidence in the record.[5]

However, since the ALJ "did not cite *any* medical opinion to dispute the treating physician['s] conclusions," *Balsamo*, 142 F.3d at 81, regarding the nature and severity of

---

[5] This is merely a possibility. Since the consultative examinations preceded Dr. Bogard's treatment by about one year, and did not consider the specific mental impairments relating to appropriate workplace functioning, it is unclear whether they would constitute substantial evidence to support the ALJ's residual functional capacity determination. While there is no per se rule stating that the one-time examinations of non-treating consultative physicians or non-examining sources cannot constitute substantial evidence, the Second Circuit has repeatedly emphasized that such sources will rarely rise to the level of substantial evidence capable of undermining a treating physician's findings. *See Selian*, 708 F.3d at 420 (cautioning ALJs to "not rely heavily on the findings of consultative physicians after a single examination").

Rolon's impairments, the ALJ did not provide good reasons as required by the treating physician rule. The Court cannot "affirm an administrative action on grounds different from those considered by the agency," *Burgess*, 537 F.3d at 128 (quoting *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999)), and courts "do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and we will continue remanding when we encounter opinions from ALJs that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion." *Halloran*, 362 F.3d at 33. On remand, the ALJ must properly apply the treating physician rule to consideration of Dr. Bogard's findings on the nature and severity of Rolon's impairments.

### B. New and Material Evidence

Rolon argues that the Appeals Council erred by denying review and not remanding for additional consideration of his April 2011 CT scan, submitted after the ALJ's September 2010 decision. Regardless of whether this was error, "the court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g). Because the CT scan evidence submitted by Rolon did not exist until after the ALJ's hearing, it is "new" and there exists "good cause" for the failure to incorporate it into the record prior to the hearing. *See Pollard v. Halter*, 377 F.3d 183, 193 (2d Cir. 2004). The pertinent issue is whether the CT scan is "material," i.e., that it is "(1) 'relevant to the claimant's condition during the time period for which benefits were denied' and (2) 'probative,'" and (3) there is a "reasonable possibility that the new evidence would have influenced the [Commissioner] to decide claimant's application differently." *Id.* (quoting *Tirado v. Bowen*, 842 F.2d 595, 597 (2d Cir.1988)).

The Court finds that the new evidence was relevant to the time period for which benefits were denied. Although performed after the ALJ's decision, the scans can reasonably be presumed to reflect Rolon's prior condition, and therefore directly support his testimony and

19

complaints of a herniated disc and chronic pain during that time.[6] The material is also probative, in that it may provide objective medical evidence of Rolon's impairment, and may support his testimony and complaints. The ALJ's decision did find that Rolon had a disorder of the back, but found that his "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the [consulting examiners'] residual functional capacity assessment. R. 94–97. The ALJ also rejected the FEGS physician's assessment in part because it was "not supported by the medical evidence" and "[t]here is no objective medical evidence of a significant worsening of [Rolon's] back since in [sic] he stopped working in 2005." R. 97. There is a reasonable possibility that consideration of the CT scans would affect these findings, and thereby change the step four residual functional capacity determination and subsequent analysis. The Court therefore orders that the new and material evidence now found in the administrative record be considered upon remand.

## IV. CONCLUSION

Due to the legal errors in the ALJ's decision, the Commissioner's motion for judgment on the pleadings is DENIED, and Rolon's motion is GRANTED. This matter is REMANDED for further administrative proceedings consistent with this memorandum and order. The Clerk of the Court is directed to enter judgment.

SO ORDERED.

Dated: Jan 22, 2014
New York, New York

ALISON J. NATHAN
United States District Judge

---

[6] The Appeals Council apparently considered the CT scan to relate to the relevant time period. Upon submission of new evidence that "does not relate to the period on or before the date of the [ALJ] hearing decision, [it] will return the additional evidence to [the claimant] with an explanation as to why it did not accept the additional evidence." 20 C.F.R. §§ 404.976(b)(1), 416.1476(b)(1). Instead, however, the Appeals Council denied review, stating that it "considered . . . the additional evidence . . . [and] . . . found that this information does not provide a basis for changing the Administrative Law Judge's decision." R. 1–2.